**Dale E. LYCAN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 48A02–9410–CR–637.**

Court of Appeals of Indiana.

Sept. 25, 1996.

William D. McCarty, Anderson, for Appellant–Defendant.

Pamela Carter, Attorney General, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Dale E. Lycan (Lycan) was convicted of murder,[1] burglary,[2] conspiracy to commit burglary,[3] and possession with intent to deliver ten or more pounds of marijuana.[4] We restate the issues as follows:

1. *See* I.C. 35–42–1–1 (Burns Code Ed. Repl. 1994).

2. *See* I.C. 35–43–2–1.

3. *See* I.C. 35–41–5–2; n.2, *supra*.

1) Whether the trial court erred in admitting evidence concerning a MAC–10 semi automatic pistol carried by Lycan shortly before the murder, and found unloaded in Lycan's van at the crime scene;

2) Whether the trial court erred in permitting testimony elicited during the State's redirect examination concerning a silencer found in Lycan's van at the crime scene;

3) Whether the trial court erred in permitting the State to elicit testimony on cross-examination concerning weapons, other than the murder weapon, which Lycan had purchased;

4) Whether the State presented sufficient evidence that Lycan ever possessed marijuana; and

5) Whether the State presented sufficient evidence that Lycan possessed ten or more pounds of marijuana?

We affirm in part, and reverse in part.

Stated most favorably to the judgment, the facts reveal that throughout 1993, Lycan and the murder victim, Larry Montgomery (Montgomery), had been partners in a marijuana distribution scheme in Anderson. Over the course of that year, however, the relationship between the two deteriorated, apparently in large part due to money owed by Montgomery to Lycan and by both to their drug suppliers. There was testimony that the debt to the suppliers would be extinguished if Montgomery's whereabouts were revealed to the suppliers or if Montgomery were shot.

Because his relationship with Lycan had crumbled, Montgomery sent his girlfriend, Jackie Parke (Parke), to Lycan's trailer on November 13, 1993, for the purpose of retrieving a key to Montgomery's trailer, and to tell Lycan that Montgomery did not want any further association. On November 14, Lycan and Rebecca Webb (Webb), with whom Lycan lived, awoke around two o'clock in the afternoon. Later that afternoon, they went to the home of Lisa Rehmel (Rehmel),

4. *See* I.C. 35–48–4–10(a)(2); (b)(2)(A). Lycan was charged for the murder by a separate information from the other offenses. The charges were consolidated for trial upon motion of the State, and Lycan did not oppose consolidation.

where it was agreed that Lycan and Webb would burglarize Montgomery's trailer. Rehmel was to notify Lycan by a pager when Montgomery and Parke, who were to arrive at Rehmel's somewhat later, left Rehmel's to return to their trailer.

Around five-thirty or six o'clock that evening, Lycan and Webb went to the trailer shared by Montgomery and Parke. After Webb ascertained that no one was home, Lycan boosted Webb through a window in the back of the trailer, and inside, Webb took ten ounces of marijuana, as well as seventeen compact discs. Lycan and Webb then went to the home of Donald Green (Green), where Webb gave the discs and marijuana to Green in return for $700.00. Around ten o'clock that evening, Lycan and Webb went to Bud and Joe's Tavern, where they met with friends and drank.

At some point in the evening after Lycan and Webb had burglarized their trailer, Montgomery and Parke returned and discovered what had happened. Suspecting that Lycan had been involved, Montgomery and Parke drove around Anderson searching for Lycan, in order to confront him about the incident. They did see Lycan's van parked outside of Bud and Joe's, but Montgomery did not choose to confront Lycan there. After seeing Lycan's van at Bud and Joe's, they ceased searching for Lycan, and began to drive home.

Sometime after midnight, Lycan and Webb left Bud and Joe's, and returned to their trailer. When they arrived, they discovered that their trailer had been broken into, and Webb, who had been given a Colt Commander .45 caliber gun by Lycan earlier in the day, entered the front of the trailer, while Lycan went around the back. Webb testified, over objection, that Lycan was armed with a MAC–10 semi-automatic pistol while at the trailer. Webb also testified that, after searching the trailer, Lycan emerged with a suitcase, which she believed contained marijuana. Lycan placed it in the trunk of a car belonging to Leslie Gates (Gates) and Charlie

Murdock (Murdock). Lycan then attempted to persuade Webb to return to Montgomery's trailer, but she declined to do so, and Lycan took the Colt Commander back from her. At that point, according to Webb, Lycan was acting "[n]ot himself ... delirious." Record at 900.[5]

After being at the trailer for approximately fifteen minutes, Webb then departed with Gates and Murdock for a Motel 6. She testified that it was approximately a fifteen minute drive, assuming compliance with traffic laws. When they arrived at the Motel 6, they saw Lycan's van in the middle of the parking lot, still running. Webb exited Gates' car, and went to park the van. Webb then observed Lycan coming out of a room at the motel, and she gave him the keys to the van. Lycan at that time told Webb, Gates and Murdock to leave. Those three then went to the motel office in order to rent a room, since they were at that time unable to find the room of some of their friends from Bud and Joe's, who had gone to the motel to have a party.

Shortly after Webb, Gates and Murdock left to go to the Motel 6 office, Montgomery and Parke drove by the motel, spotted Lycan's van, and entered the motel parking lot. They pulled up beside the van, Montgomery honked the horn, and Lycan emerged from a room. According to Parke, Lycan came out with a gun, and Montgomery, who was unarmed, got out of the car to confront him. The two began arguing about money and who had stolen from whom and called each other names. According to Parke, the two engaged in some pushing and shoving, and while Montgomery was taking off one of his boots, in order to gain traction for a fight, Lycan knocked Montgomery's hat off of his head. Shortly after that, Lycan shot Montgomery in the stomach. Parke testified that Lycan was moving toward Montgomery at the time of the shooting, and was not attempting to retreat or move away. The only other eyewitness to the shooting, who observed it through his motel room window, did

---

5. The record suggests that Parke and Montgomery committed the burglary upon Lycan's trailer; however, while reference was made to this in the State's opening argument, no evidence to that end was presented to the jury, because the State's objection to Lycan's questioning of Parke on this issue was sustained.

not testify that he saw Lycan retreat at any point during the confrontation. The shooting occurred sometime between one o'clock and one-fifty in the morning, when police were dispatched.

Immediately after the shooting, Lycan went to a room in the motel which had been rented by some friends, including Rehmel, where he stated that he had shot Montgomery. Lycan entered a car with Rehmel and a few others, and they were beginning to drive from the scene when they were stopped by a police officer. The officer told them they could not leave the scene, and Rehmel told Lycan to get of the car, which he did. Lycan then attempted to hide in another car, and upon being told by the car's owner to get out, returned to the room where his friends were staying. There he attempted unsuccessfully to trade his boots to one of his friends for a pair of tennis shoes. Lycan was thereafter told by one of the room's occupants to leave, which he did. Ultimately, Lycan was captured by police some two hours after the shooting attempting to flee on foot.

Prior to getting into Rehmel's car, Lycan threw a gun, which turned out to be the Colt Commander .45, to one of Rehmel's friends, who then threw it into the parking lot. Tests later revealed that the Colt Commander .45 was the weapon used in the shooting. After apprehending Lycan, police conducted a search of his van, where they discovered the MAC–10 Lycan had previously displayed at his trailer, as well as what appeared to be a silencer or suppressor-type device.

After leaving the Motel 6, Gates and Murdock disposed of the suitcase Lycan had earlier loaded into the trunk of their car by throwing it out in a rural area. Some time thereafter, Webb contacted Murdock, ascertained that Murdock had disposed of the suitcase, and went to retrieve it. Webb returned to Rehmel's house with a grocery sack and two trash bags full of marijuana. Webb, who had disposed of some of the marijuana because it was wet, made arrangements to sell a portion of the marijuana to Gerry Wittebort (Wittebort). Webb went to Wittebort's house, where she sold a quantity of marijuana to him. The marijuana was weighed at the time of sale, and it weighed

between 1½ and 1 3/4 pounds. The marijuana was, however, very wet when weighed. Eventually, this portion of the marijuana was turned in to police by Wittebort. The rest of the marijuana, which was also wet, was eventually recovered from the trunk of Rehmel's car. Together, the sum of the marijuana recovered weighed, at the time of first weighing by the police, approximately 10½ pounds.

At trial, Lycan did not dispute that he shot Montgomery; rather, he argued that he did so in self-defense. Lycan asserted that it was Montgomery who brought the Colt Commander .45 to the Motel 6, that Lycan took the gun from Montgomery in the course of a struggle in the parking lot, and that he shot Montgomery as he was retreating from the fracas.

Lycan also elicited on cross-examination of a detective who weighed the marijuana that the weight of the marijuana recovered included portions of the marijuana plant other than that contained within the statutory definition of marijuana, and also included an undetermined amount of external water weight. Pursuant to permission of the trial judge, Lycan had the marijuana re-weighed at the time of trial. When re-weighed, the marijuana weighed slightly over nine pounds.

**I**

Lycan first argues that the trial court erred in admitting evidence concerning the MAC–10 semi-automatic pistol which Lycan possessed at the time he searched his trailer, and which was found unloaded in his van at the shooting scene. We disagree.

At the time of Lycan's objection, Webb was testifying as to what occurred sometime after midnight on November 14, when she and Lycan searched their trailer upon discovering that it had been burglarized. Lycan's trial counsel objected, arguing that the MAC–10 was irrelevant because it was later found unloaded in Lycan's van, was not alleged to have been used in the commission of the crime, and was "highly prejudicial". Record at 890. Nonetheless, while admitting that it was "somewhat tenuous", the trial court overruled Lycan's objection, stating that the MAC–10 could be admitted to show

"that there were other weapons available to Mr. Lycan." Record at 892.

We disagree with the trial court's rationale for receiving evidence concerning the MAC–10, since under *either* the defense or the prosecution's version of events, the MAC–10 was not relevant in terms of its accessability to Lycan at the Motel 6. Lycan's defense theory was that he was accosted by Montgomery, who was armed with the Colt Commander .45, in the parking lot. In the ensuing struggle, Lycan argued, Lycan wrestled the weapon away from Montgomery and shot him as he was retreating. If this were true, the unloaded MAC–10 located inside of Lycan's van would not be relevant to what transpired between Lycan and Montgomery in the parking lot, since Lycan would not have had nearly enough time to access the van, retrieve the MAC–10, load the MAC–10, and use it defensively.

Conversely, the State's theory was that Lycan brought the Colt Commander .45 with him to the Motel 6 in order to either look for Montgomery or deal drugs. Again, under that scenario, the unloaded MAC–10 in Lycan's van would have no relevance to what transpired in the physical confrontation between Lycan and Montgomery in the parking lot, since Lycan already possessed the means by which to defend himself and/or shoot Montgomery. Nonetheless, we feel that evidence concerning the MAC–10 was admissible.[6]

We begin by registering our agreement with the State concerning precisely which of Lycan's appellate arguments are before us. At trial, Lycan objected to evidence concerning the MAC–10 on the basis of relevancy and prejudice. Upon appeal, however, Lycan's brief interweaves argument suggesting that we should view evidence of the MAC–10 as evidence of uncharged misconduct under Ind. Evidence Rule 404(B). *See* Appellant's Br. at 13–14. A defendant may not object to the admission of evidence on one ground, then argue a different ground upon appeal. *Dickerson v. State* (1986) Ind., 488 N.E.2d 346, 348.

By contrast, we are also unable to utilize one of the State's proffered justifications for admissibility—that evidence concerning the MAC–10 was admissible under the theory of *res gestae* because the weapon was found at the crime scene—since our supreme court has recently held in *Swanson v. State* (1996) Ind., 666 N.E.2d 397, *reh'g denied,* that the *res gestae* theory "has not survived the adoption of [the Indiana Rules of Evidence]." *Id.*[7] Thus, our only inquiry here concerns whether evidence pertaining to the MAC–10 was relevant, and whether its relevance was clearly outweighed by any prejudicial effect.

The admissibility of evidence is predicated upon its relevance to an issue in the case; that is, evidence which tends to make the existence of a material fact more or less probable is relevant. *See Rafferty v. State* (1993) Ind.App., 610 N.E.2d 880, 883. In order to be admissible, the evidence need only have some tendency, however slight, to make the existence of the fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused. *Tynes v. State* (1995) Ind., 650 N.E.2d 685, 687; *Malott v. State* (1985) Ind., 485 N.E.2d 879, 884. Trial courts are afforded great latitude with respect to the admissibility of evidence, and their rulings upon evidentiary matters will not be disturbed absent an abuse of discretion resulting in the denial of a fair trial for the accused. *Garrett v. State* (1992) Ind., 602 N.E.2d 139, 142, *reh'g denied; Andrews v. State* (1987) Ind.App., 505 N.E.2d 815, 823–24.

In the present case, a major issue at trial was whether Lycan or Montgomery had possession of the Colt Commander .45 on November 14. Vital to the State's assertions that Lycan had possession of the gun, there-

---

6. Where evidence has been properly admitted, though for an erroneous reason, no error occurs. *See Hyde v. State* (1983) Ind., 451 N.E.2d 648, 650.

7. We note, however, that the State favored us with only a single conclusory sentence, unsupported by argument or citation to authority, as to the manner in which, or reason why, the *res gestae* theory would have supported the evidence's admissibility.

fore, was the testimony of Webb, Lycan's live-in companion, who was with Lycan for much of the day on November 14.[8] Webb testified that Lycan had given her the .45 on the 14th prior to burglarizing Montgomery's trailer, and she positively identified the weapon at trial as the one she possessed. She testified that, a few minutes after they had arrived at the trailer, Lycan took the .45 back from her and left. She also testified that, although Lycan asked her to go to Montgomery's trailer with him, she did not leave with Lycan "because I was getting fed up with all the guns and everything." Record at 898.

Webb's evidence with regard to the MAC–10 was relevant with respect to rebutting Lycan's claim of self-defense. By claiming self-defense, Lycan placed upon the State the burden of disproving his defense beyond a reasonable doubt. *Butler v. State* (1989) Ind., 547 N.E.2d 270, 271. He also made his relationship with and attitude toward Montgomery an important issue in the case. *See Robinson v. State* (1977) 266 Ind. 604, 608–09, 365 N.E.2d 1218, 1222, *cert. denied,* 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (evidence of prior threat by defendant against victim relevant as to defendant's state of mind, and weapon brandished at time of earlier threat admissible to corroborate witness' account of threat). It was Lycan's contention at trial that he simply wanted to avoid Montgomery, and that the confrontation at the Motel 6 happened in spite of Lycan's attempts to keep his distance from Montgomery.

Webb testified that, approximately one hour before the shooting, Lycan was in possession of the MAC–10, and had the intention of proceeding directly to Montgomery's trailer. At that time, according to Webb, he was "[n]ot himself . . . delirious." Record at 900. Under these circumstances, we think an inference could properly be drawn that Lycan was not trying to avoid Montgomery, and in fact had some intention of doing him harm.

While it appears that Lycan did not go to Montgomery's trailer, but rather to the Motel 6, the shooting occurred only about an hour after Lycan had brandished the MAC–10 at his trailer. Immediately after the shooting, there was testimony that Lycan shouted, "Now I got you m —— f ——." Record at 1130. Given the close temporal relationship between Lycan's possession of the MAC–10 and the shooting, considered in light of the testimony that Lycan never retreated from the confrontation, and his statement immediately following the shooting, the evidence concerning the MAC–10 had at least some probative value with respect to rebutting Lycan's claim of self-defense.

We must, nonetheless, consider whether any unfair prejudicial impact of the MAC–10 so outweighed its probative value, that it ought to have been excluded notwithstanding its marginal relevance. *Hansford v. State* (1986) Ind., 490 N.E.2d 1083, 1089–90. Lycan cites to a multitude of cases from other jurisdictions, both state and federal, in support of his assertion that "[t]he general rule is that weapons which are shown not to have been used in the commission of a crime are not relevant and highly prejudicial." Appellant's Br. at 8. As a general proposition, we agree that the introduction of weapons not used in the commission of the crime and not otherwise relevant to the case may have a prejudicial effect. *See Tynes, supra,* 650 N.E.2d at 687; *see also Morris v. State* (1979) Ind.App., 397 N.E.2d 1056, 1057 (error to admit handgun not alleged to have been used in crime found in possession of passenger in defendant's car when defendant arrested seventeen days after crime occurred). However, we have already concluded that evidence concerning the MAC–10 was relevant to the conflicting theories of the case. Given the tendency of the MAC–10 to corroborate vital aspects of the State's case against Lycan, we cannot say that its prejudicial impact so outweighed its probative value that

---

8. Parke also testified that Montgomery did not possess the Colt Commander .45 on the 14th; however, given Parke's romantic involvement with Montgomery, Webb's testimony concerning Lycan's possession of the .45 could not be said to be merely cumulative or unnecessary. One witness's testimony may be found to be entirely credible while another witness may be very much less credible. *See Tyson v. State* (1993) Ind.App., 619 N.E.2d 276, 304, *trans. denied* (Sullivan, J., dissenting).

it necessarily ought to have been excluded. We find no error in the admission of evidence concerning the MAC–10.

## II

■ On direct examination of one of the detectives investigating the case, the witness indicated that he had taken some of Lycan's personal papers into his possession. On cross-examination, the defense elicited that among the personal papers of Lycan's was a gun permit. The defense further elicited that the permit gave Lycan the legal right to carry both the Colt Commander .45 and the MAC–10 in his van. On redirect, the State sought to elicit information about a silencer device that was found in Lycan's van at the crime scene, and Lycan objected on the ground that it was outside the scope of cross-examination. Lycan now argues that the trial court erred in permitting the State to elicit evidence concerning the silencer on redirect examination. We disagree.[9]

■ The role of redirect examination is to address new matters brought up upon cross-examination, and to correct false or misleading impressions left after cross-examination. *Jones v. State* (1992) Ind., 600 N.E.2d 544, 547. The proper scope of redirect examination is a matter within the sound discretion of the trial court, and will not be disturbed absent an abuse of that discretion. *Id.*

■ It was proper to permit this redirect examination. By eliciting that he had a permit which entitled him to carry the MAC–10 in his van, Lycan sought to imply that it was legal for him to have the MAC–10 in his van at the time of the shooting. The legality of Lycan's possession of the MAC–10 was not raised by the State on direct examination. Therefore, this issue was raised for the first time on cross, and the State properly sought to rebut the implication that Lycan's possession of the MAC–10 in his van at the time of the shooting was legal by demonstrating that Lycan also had in his van an attachment to the MAC–10 which was both illegal in and of itself, and which caused possession of the MAC–10 to be illegal when attached. "Once a party opens a subject on cross-examination, it is permissible for the opposing party to pursue that subject on redirect examination." *Dooley v. State* (1981) Ind., 428 N.E.2d 1, 6. The trial court did not abuse its discretion in permitting this redirect examination.

## III

■ During his case-in-chief, Lycan elicited from a detective that a check of the records of a local gun dealer revealed that, more than one year prior to the shooting, Lycan had purchased a Colt Commander .45 similar to, but with a different serial number from, the weapon which killed Montgomery. On cross-examination, the trial court permitted the State to question the detective concerning an extensive list of other weapons purchased by Lycan from the local gun dealer. Lycan now argues that the trial court erred in permitting the State to elicit this testimony on cross-examination. Again, we reject his argument.[10]

9. As alluded to in the introduction to this opinion, Lycan's brief attempts at various points to interweave a variety of arguments under a single heading of asserted error. With respect to evidence concerning the silencer, it appears that Lycan is attempting to make two separate arguments. First, citing *Evans v. State* (1994) Ind. App., 627 N.E.2d 832, he seeks to characterize the evidence as an "evidentiary harpoon", since it was not demonstrated at trial that the silencer was operational. Br. of Appellant at 14–17. With respect to this contention, we first observe that our supreme court vacated that portion of *Evans* which Lycan seeks to apply to his case, and specifically repudiated that portion of this court's opinion from which Lycan quotes at length. *Evans v. State* (1994) Ind., 643 N.E.2d 877, 879–80.

10. Here again, Lycan has sought to avoid confining his argument to those issues appropriately preserved for our review. During the cross-examination testimony at issue, the officer referred to an AK–47 rifle as an "assault rifle". Record at 1283. Lycan now argues that the "designation of the [AK–47] as being an 'assault rifle' was the officer's contribution of an evidentiary harpoon to the case." Br. of Appellant at 20. He also argues that the description of the weapon as an "assault rifle" is inaccurate.

There are at least two distinct problems with Lycan's pursuit of this argument. First, as he appears to acknowledge in his brief, trial counsel did not object to the characterization or move for a mistrial; indeed, counsel questioned the officer concerning the characterization. Second, Lycan's appellate argument so interweaves his pro-

As with redirect examination, the proper scope of cross-examination is a matter within the trial court's discretion, and we will reverse only upon a showing of abuse of that discretion. *Marbley v. State* (1984) Ind., 461 N.E.2d 1102, 1107; *Nasser v. State* (1995) Ind.App., 646 N.E.2d 673, 681. Generally, cross-examination must be directed toward issues raised upon direct examination. However, "[i]t is well settled that the scope of permissible cross-examination extends to all phases of the subject matter covered in direct examination and is not limited to those parts specifically included in the direct examiner's questions." *Talley v. State* (1980) Ind. App., 400 N.E.2d 1167, 1171.

By questioning the detective concerning the records of the local gun dealer, Lycan was attempting to suggest that, because he had purchased and was the owner of a Colt Commander .45 other than the murder weapon, the Colt Commander .45 he had in his possession (as testified to by Webb) shortly before the shooting was not the murder weapon. He was seeking to bolster his theory that Montgomery had brought the Colt Commander .45 used in the shooting, which Lycan claimed to have given Montgomery some time prior to the shooting, to the Motel 6. In so doing, he was necessarily stating that he was the owner of guns other than those which had already been linked to him in the trial. "Where a defendant raises an issue on direct examination, he cannot thereafter close the door on the subject at his convenience." *Jones v. State* (1986) Ind., 500 N.E.2d 1166, 1170. Permitting inquiry into weapons other than the Colt Commander .45 which Lycan established that he had purchased from this gun dealer was within the discretion of the trial court, and we find no error.

## IV

Lycan next argues that the State failed to produce sufficient evidence at trial to show that he was ever in possession of the marijuana recovered. We disagree.

When reviewing a claim of insufficient evidence, we neither reweigh evidence nor judge the credibility of witnesses. We will only consider that evidence favorable to the judgment, along with any reasonable inferences therefrom, and determine whether there was sufficient evidence of probative value to support the conviction. *Hicks v. State* (1993) Ind.App., 609 N.E.2d 1165, 1166.

Lycan's argument on this point is premised upon his assertions that no one stated unequivocally at trial that the suitcase Lycan retrieved at his trailer contained marijuana, and that the marijuana retrieved by Webb was apparently not packaged in the suitcase Lycan had loaded into Murdock's trunk. Admittedly, the witnesses offered equivocal testimony concerning the contents of the suitcase at the time Lycan retrieved it from the closet in his trailer; however, these shortcomings do not amount to an insufficiency of evidence against Lycan.

While she admitted upon cross-examination that she did not look inside the suitcase when Lycan retrieved it from the closet, Webb testified without objection that the suitcase retrieved by Lycan contained marijuana. She also testified to the specific location at which Murdock told her he had disposed of the marijuana, and that she and another person went to that location and recovered the marijuana. While Murdock did not admit to taking the marijuana out of the suitcase prior to disposing of it, and stated on cross-examination that Lycan had not told him that the suitcase contained marijuana, Murdock testified on direct examination that Lycan "might have said there was a bag of marijuana or something in [the suitcase]." Record at 970. Rehmel testified that Webb returned with the marijuana to her house, and testified that they delivered a portion of it to Wittebort. All of this was

testations concerning the alleged inaccuracy of the characterization with his argument concerning whether the overall listing of other weapons purchased by Lycan was outside the scope of direct examination (which is properly before us, as it appears to have formed the basis of Lycan's trial counsel's objection), that we will disregard

the former. *See Alleyn v. State* (1981) Ind., 427 N.E.2d 1095, 1098.

We have endeavored, as evidenced by our expansion of Lycan's three allegations of error into five, to consider on the merits as many of Lycan's claims as have been fairly presented and appropriately preserved for review.

corroborated by the marijuana found to be in Rehmel's car and delivered by Wittebort to the police on demand.

In order to prove that Lycan possessed the marijuana, it was not necessary to demonstrate that he was in possession *at the time the marijuana was recovered.* *Wilburn v. State* (1982) Ind., 442 N.E.2d 1098, 1101. From the testimony recited above, along with the eventual recovery of marijuana, it was permissible for the jury to infer that Lycan had retrieved marijuana from his trailer on November 14 and placed it in Murdock's car, and that the marijuana recovered by Webb later from the location at which Murdock told her he had discarded the suitcase, of which she later sold a portion, was the same marijuana Lycan had possessed. There was sufficient evidence from which a reasonable trier of fact could conclude that Lycan possessed marijuana on November 14.

## V

Lycan argues finally that the State failed to present sufficient evidence that he possessed ten or more pounds of marijuana. We agree.

■ Lycan's argument on this point is actually two distinct arguments, the first of which we summarily reject. Citing *Jones v. State* (1982) Ind.App., 435 N.E.2d 616, Lycan asserts that the aggregate weight of the marijuana recovered must exclude any material not contained within the statutory definition of marijuana.[11] This contention has no merit.

Examination of *Jones* reveals that it dealt with a different statutory provision—I.C. 35–48–4–11 (§ 11), which addresses only posses-

sion of marijuana—from that with which Lycan was charged. Lycan was charged under I.C. 35–48–4–10 (§ 10), which addresses delivery of or possession with intent to deliver marijuana. In concluding that only the portion of the marijuana contained within the statutory definition could be counted for purposes of an offense enhancement, the *Jones* court relied specifically upon the difference between the two statutory provisions, noting that, unlike § 10, § 11 did not provide that the "pure or adulterated" portions of the substance were to be considered. 435 N.E.2d at 619–20.[12] With respect to charges brought under § 10, the law of this state is clear that the aggregate weight of marijuana necessary to sustain an offense enhancement includes not only "pure" marijuana, but also "'other vegetable material' not fitting within the definition of marijuana." *Allison v. State* (1988) Ind.App., 527 N.E.2d 234, 238, *trans. denied; see also Burst v. State* (1986) Ind. App., 499 N.E.2d 1140, 1151, *trans. denied.* Thus, the fact that the marijuana recovered contained portions of the marijuana plant not included within the statutory definition of marijuana does not prevent the entire amount recovered from being considered with respect to Lycan's offense enhancement.

■ We reach the contrary conclusion, however, with respect to the effect of the external water weight upon the aggregate weight of the marijuana.[13] Because it was not shown at trial that the marijuana possessed by Lycan weighed ten or more pounds without counting the external water weight, we conclude that the enhancement of Lycan's conviction to a Class C felony cannot stand.[14]

A brief recital of caselaw leading to *Burst* and *Allison* is necessary to the proper resolution of this question. Previously, separate

---

11. *See* I.C. 35–48–1–19.

12. We note that § 11 now punishes the possession of "pure or adulterated" marijuana. I.C. 35–48–4–11 (Burns Code Ed. Repl.1994). Thus, the continued vitality of *Jones* on this point is doubtful at best.

13. We reject the State's argument that Lycan has waived this issue for failure to support his argument with legal authority. As this issue goes to the sufficiency of the evidence supporting Lycan's conviction upon this charge, it constitutes a question of fundamental error which we would

raise *sua sponte* even had Lycan failed to raise the issue at all. *See Miller v. State* (1993) Ind. App., 616 N.E.2d 750, 751 n. 3.

14. I.C. 35–48–4–10(a)(2) makes possession of marijuana with intent to deliver a Class A misdemeanor. Under (b)(1)(B) of this provision, the offense is a Class D felony if the amount involved is more than 30 grams but less than 10 pounds; Lycan was convicted under (b)(2)(A), which provides that the offense is a Class C felony if the amount involved is 10 or more pounds.

districts of this court had disagreed as to whether the aggregate weight of marijuana used to support an offense enhancement could only be made up of the "pure" component of the marijuana recovered. *Compare Romack v. State* (1983) Ind.App., 446 N.E.2d 1346 (holding that only weight of "pure" substance could be used for enhancement), *with Grogg v. State* (1981) Ind.App., 417 N.E.2d 1175 (total weight of recovered substance could be used to support enhancement). Subsequent to these cases, however, our supreme court held that, with respect to the statutory provision addressing dealing in cocaine,[15] an offense enhancement could be supported by reference to the "weight of the entire substance delivered by the dealer." *Lawhorn v. State* (1983) Ind., 452 N.E.2d 915, 917. In *Lawhorn,* the supreme court concluded that the total amount of substance delivered, including nonnarcotic substances which have been mixed into the drug, "is the statutory meaning as well as the usage and meaning common in drug trafficking." *Id.*

This court specifically relied upon *Lawhorn,* in holding that the "total weight of the delivered drug" was to be counted for purposes of enhancing a dealing in marijuana offense in *Burst,* 499 N.E.2d at 1150. Noting that the statutory provisions addressing dealing in cocaine and dealing in marijuana were similarly constructed, the *Burst* court tracked the supreme court's conclusion that the statutory meaning for purposes of offense enhancement was predicated upon the usage common in drug trafficking, and held that the supreme court's interpretation of the statutory provision addressing cocaine "compelled" the same result with respect to marijuana. *Id.*

While this analysis clearly dictates our rejection of Lycan's argument with respect to the other parts of the marijuana plant found within the marijuana recovered, we think it suggests the opposite conclusion with respect to the external water weight. There was no evidence at trial suggesting that the marijuana became wet because of efforts by Lycan or anyone else to increase its weight; rather, it seems clear that the marijuana became wet due to its disposal by Murdock outside after the shooting. Further, there was no suggestion at trial that enhancing the weight of marijuana by watering it is a practice common to or even found within the marijuana trafficking industry. To the contrary, Wittebort, who testified that he had purchased a portion of the marijuana, testified that the marijuana was "dripping wet", and concluded that, because this increased the marijuana's weight, he got less from his purchase than he should have. Record at 1047.

█ Thus, because our focus when looking to the aggregate weight is on whether the material other than the pure component is utilized within the trafficking industry, we conclude that external water weight, not shown to have been included for the purposes of trafficking the marijuana, is not to be included in the aggregate weight of the delivered drug for purposes of determining an offense enhancement for dealing in marijuana.

█ Nonetheless, our inquiry does not end here, for even where marijuana recovered includes material not properly considered for purposes of offense enhancement, the enhancement may stand where the State can show that the weight of the material *properly* included is sufficient to support the enhancement. *E.g., Romack, supra,* 446 N.E.2d at 1353–54; *Scott v. State* (1980) Ind. App., 404 N.E.2d 1190, 1193–94.[16] For example, in *Romack,* the total amount of recovered material was 427 grams, including material not properly included for enhancement purposes. However, the State's expert testified that the amount of the material properly included met the statutory enhancement level of thirty grams. 446 N.E.2d at 1354. This court held that the testimony was sufficient

---

**15.** *See* I.C. 35–48–4–1.

**16.** Both *Romack* and *Scott* addressed whether portions of the marijuana plant not covered by the statutory definition of marijuana could be counted toward offense enhancement. Therefore, to the extent that they either state or imply that such material is not properly counted, they are not good law, and we do not cite them for that purpose. Rather, we cite them only for their analysis of how the State may prove an aggregate weight given the presence within recovered marijuana of material not properly counted toward that weight.

to support the enhanced sentence. *Id.; accord Scott, supra* at 1190 (penalty enhancement for dealing over thirty grams of marijuana affirmed where, although sample of material tested weighed only 34.8 grams and included material not properly considered for enhancement purposes, total weight of recovered material was 130 pounds). Thus, had the State introduced evidence that, not counting the external water weight, the amount of marijuana recovered met or exceeded ten pounds, there would have been sufficient evidence to support the offense enhancement.

 Examination of the record, however, reveals that the State's expert stated on cross-examination during the State's case-in-chief that he could not state with any degree of certainty how much of the 10½ pounds of recovered marijuana had been made up of external water weight. Record at 1079.[17] Further, when recalled by Lycan in the defense's case-in-chief, the State's expert acknowledged that water loss accounted for the drop in weight to slightly over nine pounds when the marijuana was reweighed during the trial, though he did acknowledge that some of that loss might have been due to evaporation of moisture from the plant. Thus, at no point did the State produce sufficient evidence that the amount of marijuana possessed by Lycan excluding external water weight exceeded ten pounds, and the enhancement of Lycan's conviction to a Class C felony cannot stand.

Where a penalty enhancement has been imposed despite insufficient evidence, we have the power to order that the judgment be modified to that of the next lower class of offense. *Hutcherson v. State* (1978) 178 Ind. App. 8, 14–15, 381 N.E.2d 877, 881, *trans. denied* (1979) 270 Ind. 594, 389 N.E.2d 270. As Lycan was sentenced to the maximum of eight years on this count, to run consecutively with his other sentences, modification of his conviction would appear to impact his total executed sentence.

**17.** Thus, our opinion should not be read as disapproving of the State's practice of weighing marijuana at the time of seizure, as opposed to prior to trial. Our holding here is that the State

## CONCLUSION

We remand to the trial court with instructions to vacate the judgment of conviction for possession with intent to deliver ten or more pounds of marijuana as a Class C felony, enter judgment of conviction for possession with intent to deliver more than thirty grams of marijuana as a Class D felony, and resentence Lycan accordingly. In all other respects, the trial court is affirmed.

FRIEDLANDER and GARRARD, JJ., concur.

failed to prove that, *at the time of possession,* the amount of marijuana possessed by Lycan exceeded 10 pounds.