## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 26 2017, 10:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joseph A. Sobek
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brandon Thomas Woody, *Appellant-Defendant,* | July 26, 2017 |
| | Court of Appeals Case No. 43A03-1611-CR-2610 |
| v. | Appeal from the Kosciusko Circuit Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Michael W. Reed, Judge |
| | Trial Court Cause No. 43C01-1502-MR-1 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Brandon Thomas Woody was convicted of murdering Tara Thornburg and her boyfriend, Joshua Knisely. On appeal, Woody argues that the trial court abused its discretion by admitting certain evidence over his objection. Specifically, the trial court allowed evidence of (1) Thornburg's statements to the 911 dispatcher and the responding officer, (2) Woody's rap performance with a handgun, and (3) audio recordings of three rap songs performed by Woody.

[2] We affirm.

## Facts & Procedural History

[3] Woody and Kyle DeHart have been close friends for many years. They regularly perform and record rap songs together and hang out at DeHart's home. DeHart met Thomas Hursey while they were both incarcerated in 2014, and they became friends. The three began hanging out together in early 2015.

[4] On February 18, 2015, Woody spent most of the day with DeHart and Hursey either driving around or in DeHart's party room at his home.[1] Jacob Larkin also spent part of the day with them. Early that afternoon, Larkin and DeHart went to Thornburg's home to purchase marijuana. Thornburg removed an eighth of an ounce from a gallon-size bag of marijuana to sell to them. Larkin described Thornburg's supply of marijuana as expensive and "really good".

---

[1] DeHart lived with his parents and younger brother. He had separate quarters and regularly used a room attached to the garage, known as the party room or man cave.

*Transcript Vol. V* at 132. Larkin, DeHart, Hursey, and Woody later smoked marijuana together at DeHart's home and then went for a drive. Around 11:00 p.m., they drove Larkin home and then returned to DeHart's home.

[5] After DeHart and Woody spoke privately for about fifteen minutes, they came into the party room and DeHart informed Hursey that they were "trying to go pick up some weed." *Transcript Vol. III* at 47. DeHart added, "just so you know we don't intend on paying for these trees." *Id*. at 48. Hursey understood this to mean that they were going to promise to pay the dealer but never actually pay. DeHart and Woody planned to be armed with duct tape and a utility knife in DeHart's black bag. Woody also had a firearm in the waistband of his sweatpants.

[6] The trio drove to Thornburg's house around midnight. As they pulled up, DeHart noted that Knisely's vehicle was outside. Woody indicated that he was not worried about Knisely. They parked on the street, walked up the alley, and then knocked at the front door. Thornburg answered, greeting Woody by name. She led the men upstairs to her bedroom. Knisely was sleeping on the bed as Thornburg and her visitors sat on and around the bed and smoked marijuana.

[7] Woody eventually asked how much marijuana she had. Thornburg responded, "somewhere around an ounce, maybe a little more". *Id*. at 51. Woody indicated that he wanted it all and that he had the money to cover it. Thornburg weighed out an ounce of marijuana, placed it in a bag, and gave it to

Woody, who turned and handed it to DeHart with a wink. When Thornburg asked for the money, Woody stated that it was in the car and he would get it. Thornburg did not like this answer and asked for the marijuana back.

[8] After a brief pause, Woody removed one of his gloves, revealing a latex glove underneath. He then stood up as he drew a nine-millimeter handgun and pulled back the slide. Thornburg started screaming, and Hursey and DeHart jumped up and headed toward the door. Woody punched Thornburg and shot her in the face. She fell back motionless. As Knisely began to awaken, Hursey and DeHart ran from the room. Woody then shot Knisely in the back of the neck, killing him instantly. Hursey heard this second shot as he and DeHart jumped off the front porch of the house and hurried to the car. They waited briefly until Woody entered the car and then sped off.

[9] As DeHart drove them away from the scene, Woody turned to Hursey who was in the back seat and warned him not to say anything or he would "get the same thing". *Id.* at 53. DeHart assured Woody that Hursey was "cool". *Id.* at 54. DeHart then slowed the car and threw his shoes out the window and into a snow bank. Woody threw something out too. Shortly thereafter, DeHart realized that it was trash day, so he stopped and Woody put his handgun inside a bag of trash that was out for pickup. They then drove to DeHart's home, where they proceeded to burn Woody's shoes, coat, and gloves, as well as other evidence, in the backyard. Woody then dumped out the contents of the black bag and realized that the duct tape was missing.

[10] DeHart kept telling Woody how stupid he was and then said, "you just took two lives for an ounce of weed." *Id.* at 58. Woody claimed that he panicked when Thornburg began to scream. Woody said that the gun jammed as he ran out of the room and that he had dropped all but one round on the floor. Woody explained to the others that he shot Knisely with the last bullet and "saw his brains fly out". *Id.* He assured DeHart and Hursey that the victims were both dead.

[11] In the meantime, Thornburg regained consciousness and was able to get down the stairs to her phone. She called 911 at 12:29 a.m. Shortly after providing her address to the emergency dispatcher and identifying Woody as the shooter, Thornburg passed out again. Officer Joe Denton was the first to arrive at the scene within three minutes of the call. He located Thornburg lying downstairs in a pool of blood. Officer Denton's bodycam recorded the encounter, in which Thornburg again identified Woody as the shooter. She died at the hospital as a result of the gunshot wound to her head. In the bedroom, police found Knisely deceased in the bed. Police also recovered a roll of duct tape, a glove, two nine-millimeter shell casings, and three live nine-millimeter rounds.

[12] Woody left DeHart's home early in the morning, while DeHart and Hursey were still there. Around 5:30 a.m., he went to Hursey's apartment and used a secret knock. Brenda Schneider – one of Hursey's roommates – answered, thinking it was Hursey. Woody asked to stay but Schneider refused despite Woody's insistence. Woody pulled out a large bag of marijuana and smoked some of it. Schneider said he needed to go, and Woody responded that it was

cold outside. He was only wearing a sweatshirt and pair of jeans. Schneider gave him a coat, and he left.

[13] Woody was arrested later that afternoon hiding in a snow-covered vehicle, which was registered to DeHart's mother. The vehicle was parked on the side of a gas station, and Woody was inside under a blanket. DeHart had driven Woody there and then left with Asylyn Shepard, the mother of DeHart's daughter.

[14] Hursey initially denied any involvement in or knowledge of the shooting when questioned by police. On March 4, 2015, however, he gave a confession and attempted to show police where items had been discarded after the shooting. That same day, police executed a search warrant at DeHart's home. They found a burn pile in the backyard with shoe and fabric fragments, a button, and a zipper. Among other things, police also discovered a bottle of lighter fluid, a utility knife, and a black bag. Several days later two shoes were discovered in the area Hursey had described along the roadside. The shoes were "similar in size, shape and tread design" to impressions in the snow found outside Thornburg's home after the shooting. *Transcript Vol. IV* at 166. Shepard testified at trial that she thought she had seen these shoes at the DeHart home before.

[15] The State charged all three men with two counts of murder. Woody and DeHart were tried together, and Hursey testified against them. Over Woody's objection, the trial court admitted Thornburg's statements to the 911 dispatcher

and Officer Denton, three rap songs recorded and performed by Woody, and testimony about Woody's choreographed rap performance involving a handgun. At the conclusion of the jury trial on October 6, 2016, the jury found Woody and DeHart guilty as charged. On October 26, 2016, the trial court sentenced Woody to two consecutive sixty-year sentences. Woody now appeals, challenging the admission of evidence. Additional facts will be provided below as needed.

## Standard of Review

We review evidentiary rulings for an abuse of discretion, which will be found where the ruling is clearly against the logic and effect of the facts and circumstances. *Zanders v. State*, 73 N.E.3d 178, 181 (Ind. 2017). Further, the improper admission of evidence will be disregarded as harmless error if the conviction is supported by substantial independent evidence of guilt satisfying us that there is no substantial likelihood that the challenged evidence contributed to the conviction. *See Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2016).

On issues of relevance and unfair prejudice, a trial court's discretion is wide. *Snow v. State*, No. 45S03-1703-CR-169, slip op. at 4 (Ind. June 22, 2017). As our Supreme Court emphasized in *Snow*, this discretion often allows the trial court to resolve determinations under Indiana Evidence Rules 401 and 403 either way:

Trial judges are called judges for a reason. The reason is that they conduct trials. Admitting or excluding evidence is what they do. That's why trial judges have discretion in making evidentiary decisions. This discretion means that, in many cases, trial judges have options. They can admit *or* exclude evidence, and we won't meddle with that decision on appeal. There are good reasons for this. Our instincts are less practiced than those of the trial bench and our sense for the rhythms of a trial less sure. And trial courts are far better at weighing evidence and assessing witness credibility. In sum, our vantage point – in a far corner of the upper deck – does not provide as clear a view.

*Id.* at 6 (internal quotations and citations omitted; emphasis in original).

## Discussion & Decision

### 1. Victim's Statements

[18] Woody challenges the admission of Thornburg's statements to the 911 dispatcher and Officer Denton identifying Woody as the shooter. He acknowledges that the statements fall within the excited utterance exception to the hearsay rule but argues that their admission violated his right to confrontation under the Sixth Amendment to the United States Constitution.[2]

---

[2] Although he cites Article 1, Section 13 of the Indiana Constitution, he does not present a separate argument that admission of the victim's statements violated this provision of our constitution. Waiver notwithstanding, we observe that this provision guarantees face to face confrontation of witnesses, not declarants. *Ward v. State*, 50 N.E.3d 752, 756 (Ind. 2016). Because the 911 emergency operator and Officer Denton testified at trial regarding Thornburg's statements, Woody's Indiana constitutional right of confrontation was not violated. *See id*. at 756-57.

[19] "In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." U.S. Const. amend. VI. This amendment prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [s]he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

[20] The question thus becomes whether Thornburg's statements were testimonial in nature. This requires us to consider the "primary purpose of the interrogation". *Davis v. Washington*, 547 U.S. 813, 822 (2006). That is, do the circumstances objectively indicate that the statements were made/elicited for the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution or, rather, to enable police to meet an ongoing emergency? *See id*. This requires an objective analysis of the circumstances of the encounter and the statements and actions of the parties to it. *See Michigan v. Bryant*, 562 U.S. 344, 360 (2011) ("The circumstances in which an encounter occurs – *e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards – are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated.").

[21] We turn first to Thornburg's statements to the 911 dispatcher. The call proceeded as follows, with the dispatcher identified as "D" and Thornburg identified as "TT":

> D     Kosciusko County 911.

TT      Please help me.

D       What's going on?

TT      Brandon Woody.

D       What's your address?

TT      205 East Main Street.

D       Okay.  What's wrong with you?

TT      He knocked me out and shot my boyfriend.

D       Okay.  He knocked you out?

TT      And shot my boyfriend.  I'm bleeding.  My boyfriend is
        bleeding in bed.

D       Somebody shot your boyfriend?

TT      Yes please help.

D       Okay.  Hold…

TT      (Inaudible) pass out.  Please.

D       Okay where's he bleeding at?

TT      By his head.

D       Okay you don't know where he's bleeding from?

TT      His head.

D       He's bleeding from his head.

TT      Yes (inaudible).

D       Okay listen I've got a partner that's already dispatching it
        but I need to keep you on the phone okay?

TT      I'm going to pass out.

D      Okay are you…you're injured?

TT    Yeah.

D      Okay where are you hurt?  Is this Linda?

TT    Tara

D      Okay where are you injured?

TT    I can't.

D      Okay you…stay with me.  Don't…listen keep talking to me okay?

TT    (Inaudible).

D      Okay listen we're getting everybody…we're getting them out there but I need you stay talking to me okay?  Is anybody…is anybody else there with you?  Hello are you there?  Hello.  Ma'am are you there?  Tara?  Tara I need you to stay on the phone with me.  Can you hear me?

*Appendix Vol. II* at 45-46 (transcript of the recording).

[22]    Any reasonable listener would recognize that Thornburg's statements to the 911 dispatcher were made while she was facing an ongoing emergency and seeking immediate help.  Her statements regarding the identity of the shooter were spontaneous and not prompted by the dispatcher.  Moreover, it is clear that the dispatcher's sole concerns in speaking with Thornburg were to determine the nature of the ongoing emergency and dispatch assistance for the victims.  All of the circumstances surrounding the "interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency."  *Davis*, 547 U.S. at 826-28 (911 call made by a domestic violence

victim during an attack did not produce testimonial statements even though she identified her attacker).

[23] Similarly, we find that Officer Denton's brief questioning of Thornburg upon finding her three minutes after her 911 call produced only nontestimonial statements. Officer Denton was the first to arrive on the scene where two individuals had been shot. Thornburg was lying in a pool of blood on the floor crying for help. Officer Denton asked Thornburg if the shooter was still in the house, who else was in the house, and who was the shooter. All the while, he was relaying information to dispatch regarding the victims and seeking to clear the house and secure the area. Once Thornburg identified Woody as the shooter, Officer Denton asked dispatch to put an "ATL[3] on Brandon Woody". *Appendix Vol. II* at 48.

[24] Viewed objectively, the circumstances surrounding the questioning of Thornburg reveal that the primary purpose of the interrogation was to address an ongoing emergency. There was nothing formal about the questioning, and Thornburg's condition was clearly emergent. Moreover, because Officer Denton did not know the location of the shooter or the motive for the recent shooting, an ongoing emergency still existed. *See Bryant*, 562 U.S. at 374 ("there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the

---

[3] We understand ATL to stand for attempt to locate.

victim] within a few blocks and a few minutes of the location where the police found [the victim]"). Officer Denton was merely assessing the situation and the potential continuing threat to the victims, officers, and the public. *See id*. at 376. Under the circumstances, Thornburg's statements to Officer Denton were nontestimonial, and their admission at trial did not violate Woody's federal confrontation rights.[4]

## 2. Woody's Rap Performance with a Handgun

[25] Woody also claims that the trial court abused its discretion by admitting evidence that at a party about two months before the shooting he performed a rap while dancing with a handgun. He claims that the evidence constituted impermissible character evidence under Ind. Evidence Rule 404(b) and that its probative value was substantially outweighed by the danger of unfair prejudice and should have been excluded under Ind. Evidence Rule 403.

[26] John VanderReyden testified that he attended a house party on December 13, 2014. Woody was also at this party. During the party, VanderReyden observed Woody perform a choreographed rap song. Woody pulled out a semiautomatic handgun from the waistband of his pants as part of the performance. He attempted to load the handgun but the magazine fell to the

---

[4] We reject Woody's invitation to "re-examine [our] jurisprudence in regards to the dying declaration and excited utterance exceptions to the hearsay rule." *Appellant's Brief* at 23. These hearsay exceptions are set out in the Indiana Rules of Evidence – 803(2) and 804(b)(2) – and are not subject to amendment by this court. *See* Ind. Evid. Rule 1101(b).

floor. Following the beat of the music, Woody picked up the magazine and reinserted it into the handgun. Woody again attempted to chamber a round but it appeared to VanderReyden that there was a "failure to feed", meaning that the round did not enter the chamber completely.[5] *Transcript Vol. V* at 62. VanderReyden testified that Woody never pointed the handgun at anyone and there was no fear among others in the room. After the rap song, Woody returned the handgun to his pants.

[27] We quickly dispose of Woody's undeveloped argument that this evidence violated Evid. R. 404(b). Woody baldly claims that evidence that he was seen dancing with a firearm constituted evidence of a prior bad act. It did not. *See Fuentes v. State*, 10 N.E.3d 68, 73 (Ind. Ct. App. 2014) ("the possession of a firearm, generally speaking, is not a misdeed), *trans. denied*; *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*.

---

[5] Woody asserts that VanderReyden should not have been permitted to opine that the handgun jammed because he did not qualify as a skilled witness and never even held the handgun in question. A skilled witness is a person with a degree of knowledge short of that sufficient to be declared an expert but somewhat beyond that possessed by an ordinary juror. *Kubsch v. State*, 784 N.E.2d 905, 922 (Ind. 2003). Under Ind. Evidence Rule 701, such a witness may provide an opinion or inference that is rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Testimony of a skilled witness "generally needs only rise to a relatively low bar in order to be admissible." *WESCO Dist., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 683, 707 (Ind. Ct. App. 2014) (quoting *Hawkins v. State*, 884 N.E.2d 939, 945 (Ind. Ct. App. 2008), *trans. denied*). Woody has wholly failed to establish that this low bar was not met where VanderReyden's testimony established his extensive experience with firearms.

[28] Turning to Evid. R. 403,[6] we observe that Woody does not argue that this evidence had no probative value. Indeed, VanderReyden's testimony established that about two months before the murders Woody possessed a semiautomatic handgun and that the feeding mechanism had jammed on the handgun during the performance. Similarly, there was evidence presented that during the murders Woody's handgun jammed and he dropped three rounds on the floor, which were later recovered by police along with the two spent casings.

[29] Woody argues that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. He notes that the handgun used in the murders was never recovered and that the State could not establish that it was the same handgun – or even the same make, model, or caliber – as the one he was seen with at the party.

[30] He directs us to *Hubbell v. State*, 754 N.E.2d 884 (Ind. 2001), in which our Supreme Court acknowledged the "general proposition…that the introduction of weapons not used in the commission of the crime and not otherwise relevant to the case may have a prejudicial effect." *Id.* at 890 (quoting *Lycan v. State*, 671 N.E.2d 447, 454 (Ind. Ct. App. 1996)). In *Hubbell*, the Court determined that evidence of a gun found in the defendant's home and bullets found in his van were improperly admitted at trial because there was no evidence presented that a gun was used during commission of the crime. Woody's reliance on *Hubbell*

---

[6] Evid. R. 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of…unfair prejudice".

is misplaced, as the evidence here establishes that the murders were committed using a semiautomatic handgun.

[31]     Woody has failed to establish that this evidence was unfairly prejudicial, let alone that any unfair prejudice substantially outweighed the evidence's probative value. We decline to second-guess the trial court's Evid. R. 403 determination. *See Snow*, slip op. at 9.

### 3. Rap Recordings

[32]     Finally, Woody contends that the trial court abused its discretion by admitting audio recordings of three rap songs performed by him – at least one of which was written by him before 2012. He asserts that the songs contained "consistent references to inadmissible prior crimes and bad acts under rules of evidence 404 and 403." *Appellant's Brief* at 26. The thrust of Woody's argument is that the lyrics of the rap songs were highly prejudicial and of limited probative value.

[33]     The profane and disturbing lyrics of Woody's raps were indeed prejudicial and likely to inflame the jury. They referenced shooting others in the face with a nine millimeter, beating and pistol whipping people, duct taping someone's mouth, using drugs, and robbing and killing drug dealers. Further, the degree of probative value of this evidence in determining whether Woody committed murder is certainly debatable.

[34] It is unnecessary to determine, however, whether the trial court abused its broad discretion when balancing the probative value of this evidence against its potential for unfair prejudice because we conclude that any error in this regard was harmless. *See Hoglund,* 962 N.E.2d at 1238 (error will be found harmless "if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction"); *Houser v. State*, 823 N.E.2d 693, 698 (Ind. 2005) (error in the admission of evidence is harmless if the evidence's probable impact on the jury was sufficiently minor so as not to affect the defendant's substantial rights).

[35] The State presented overwhelming evidence of Woody's guilt. Most notably, Thornburg – who had known Woody since high school – identified him as the person who shot her and Knisely. Hursey also identified Woody as the shooter and provided detailed testimony regarding the events before, during, and after the shootings. Moreover, important details of Hursey's testimony were corroborated by evidence discovered at the scene of the shootings, DeHart's home, and elsewhere. In light of all the independent evidence of guilt presented at trial, we are confident that there is no substantial likelihood that the rap songs contributed to Woody's murder convictions.

[36] Judgment affirmed.

Kirsch, J. and Mathias, J., concur.