

# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**RUSSELL A. JOHNSON**
**HEATH Y. JOHNSON**
**SUZY ST. JOHN**
Johnson, Gray & MacAbee
Franklin, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN L. REITZ**
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FLOYD WEDDLE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 73A01-1209-CR-452 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE SHELBY SUPERIOR COURT NO. 1
The Honorable Jack A. Tandy, Judge
Cause No. 73D01-1101-FA-2

**June 19, 2013**

**OPINION—FOR PUBLICATION**

**BAKER, Judge**

In this case, the appellant-defendant Floyd Weddle challenges the trial court's admission of certain evidence after police officers conducted a protective sweep of his residence and subsequently searched the premises following the issuance of a search warrant. Weddle claims that the scope of the protective sweep violated both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution because the allegedly impermissible broad protective sweep of the residence led to the police officers' discovery of drugs and paraphernalia.

We find that the scope of the protective sweep of the residence was reasonable because the officers heard additional movement in the house after taking Weddle into custody, indicating that another individual might be inside and thus presenting a risk of harm to them. The police officers did, in fact, locate other persons in the house. Therefore, the evidence that the police officers seized during the subsequent search of the residence was properly admitted at trial, and we affirm the judgment of the trial court.

## FACTS[1]

On October 15, 2010, at approximately 10:33 a.m., several officers from the Shelby County Sheriff's Department went to Weddle's residence to serve him with an arrest warrant for the crimes of theft and false informing. At some point, Detective Darren Chandler had learned that Weddle and/or Vicki Hall were manufacturing and dealing in methamphetamine. Detective Chandler knew that Hall had been purchasing Sudafed, which contains pseudoephedrine, from a local CVS drugstore.

---

[1] We heard oral argument in this case on May 22, 2013, in Indianapolis. We commend counsel for their able presentations.

2

When they arrived at Weddle's residence, the officers saw two vehicles parked outside. One was registered to Weddle and the other to Hall. Detective Chandler also had additional information that April Adams, who had children with Weddle, sometimes stayed at Weddle's residence.

Deputy Sheriff Larry Allen and Detective Chandler approached Weddle's front porch, while Sergeant James Thurman walked to the side of the house. The officers noticed surveillance cameras on the front porch and near the garage.

Detective Chandler knocked on the front door of Weddle's residence, announced his presence several times, and identified himself as a police officer. Immediately thereafter, the officers saw the blinds on Weddle's front door move and heard movement inside the house. At that time, the officers decided to enter the house. The door was unlocked, and they walked in at 10:35 a.m. Deputy Allen testified that the front room looked like a "pig sty," with "trash piled up." Tr. p. 8, 15-17, 386. The officers saw Weddle in that room and placed him in custody at 10:36 a.m.

Sergeant Thurman and Detective Chandler heard additional movement in the back of the house and believed that there was another individual in the residence. Detective Chandler also heard noises from the back of the house. Detective Chandler asked Weddle if anyone else was in the house, and Weddle responded that Hall was in the bedroom. Sergeant Thurman heard a female voice, went into the bedroom, and saw Hall. He immediately ordered Hall to the living room.

3

Detective Chandler then asked Weddle whether anyone else was in the residence. Weddle stated that he "was not sure." Tr. p. 63, 99, 456. Following Weddle's response, the officers commenced a protective sweep of the residence. Sergeant Thurman stated they performed the task "so that we're not both stuck in one area and trapped and ambushed." Id. at 50, 456. Detective Chandler explained that the protective sweep amounted to a "quick look through the house to look for people" so that no one could "come up behind us, you know, with a gun, a knife or whatever, to make sure we're safe standing in that house." Id. at 457.

Detective Chandler walked toward the back of the house, through an open door, and moved "very quickly" through each room, searching for other individuals. Id. at 64, 67, 101. In one of the rooms, Detective Chandler smelled an odor that he associated with the manufacture of methamphetamine and saw a marijuana plant in plain view on a work bench. In the back room, Detective Chandler observed a green blanket hanging from the wall, saw feet behind the blanket, and found a woman crouched behind the blanket. Detective Chandler escorted the woman to the front of the house at 10:42 a.m. The woman stated that she had no identification.

The identifying information that the woman initially supplied to the officers was not verifiable through police dispatch, which further raised the officers' suspicions. The officers subsequently learned that the woman was Lindsay Burton, and a warrant for her arrest had been issued in Johnson County. Deputy Allen then arrested Burton and transported her to jail.

The officers ended the protective sweep after Burton was arrested. Detective Chandler testified that he did not search the entire residence; there were a "couple [rooms unsearched]." Tr. p. 105, 458. Moreover, the blanket was the only item that Detective Chandler looked behind during the protective sweep. Deputy Allen did not enter any of the other rooms, and Sergeant Thurman never went past the room where Hall was located.

Although Detective Chandler asked Weddle for his consent to search the remainder of the residence, Weddle refused. As a result, Detective Chandler obtained a search warrant and executed it at approximately 12:30 p.m. Indiana State Police Chemist Carl Sobieralski arrived at the scene and found two mason jars containing clear liquids, some coffee filters, an off-white substance, several plastic funnels, a one-gallon bottle of Crown Toluol, an organic solvent, pseudoephedrine, anhydrous ammonia, and ten marijuana plants.

Sobieralski testified that the items found in the residence were indicative of a methamphetamine laboratory. Samples of the liquids tested positive for methamphetamine, and the plants were confirmed as marijuana.

On October 15, 2010, Weddle was charged as follows:

Count I—Manufacturing Methamphetamine, a class A felony
Count II—Possession of Methamphetamine, a class B felony
Count III—Possession of Drug Lab Precursors, a class D felony
Count IV—Maintaining a Common Nuisance, a class D felony
Count V—Possession of Marijuana, a class A misdemeanor
Count VI—Possession of Marijuana, a class A misdemeanor.

5

Appellant's App. p. 24-25, 101-02.

On May 18, 2011, Weddle filed a motion to suppress, claiming that the police officers' search of his residence was unconstitutional because he did not consent to the search. Weddle also alleged that the protective sweep of the residence exceeded the scope of a search that was allowable under the arrest warrant. As a result, Weddle claimed that his rights under the Fourth Amendment and Article I, Section 11 of the Indiana Constitution were violated. Following a hearing, the trial court denied Weddle's motion to suppress on July 22, 2011.

We denied Weddle's motion to accept jurisdiction of this case as an interlocutory appeal, and following a three-day jury trial that commenced on February 28, 2012, Weddle was found guilty as charged. Weddle was sentenced to an aggregate term of thirty-five years in the Indiana Department of Correction (DOC). The trial court subsequently granted Weddle's motion to correct error in part and vacated the conviction in Count V. Weddle now appeals.

DISCUSSION AND DECISION

Weddle raises several arguments that we consolidate and restate as follows: Whether the scope of the protective sweep and warrantless search of the residence that the officers conducted were unreasonable under the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution? As a result, Weddle contends the trial court erred in admitting the evidence at trial that the police seized from the residence.

We initially observe that the decision to admit or exclude evidence is within the trial court's sound discretion. Johnson v. State, 831 N.E.2d 163, 168-69 (Ind. Ct. App. 2005). We will reverse only upon a showing of manifest abuse of discretion that results in the denial of a fair trial. Id. We do not reweigh the evidence and will consider conflicting evidence in a light most favorable to the trial court's ruling. Cole v. State, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007).

### I. Fourth Amendment Claims

Weddle argues that his convictions must be set aside because the police officers performed an impermissibly broad protective sweep of the entire residence, which resulted in the discovery of the drugs and paraphernalia. As a result, Weddle argues that the trial court should have excluded all of the evidence that was seized during the alleged improper search.

When executing an arrest warrant, a law enforcement officer may break open any outer or inner door or window, if he is not admitted inside following an announcement of authority and purpose. State v. Estep, 753 N.E.2d 22, 26 (Ind. Ct. App. 2001); Ind. Code § 35-33-2-3(b). Thereafter, protective sweeps may be conducted, which our Supreme Court has observed as follows:

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing

7

that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Maryland v. Buie, 494 U.S. 325, 334-35 (1990); see also Estep, 753 N.E.2d at 26.

A protective sweep is authorized under Buie either of rooms immediately adjoining the place of the arrest or of areas that might, given facts articulable by the searching officer, contain a hiding person who might jeopardize officers' safety. Buie, 494 U.S. at 334-35.

Notwithstanding this pronouncement, Weddle maintains that the evidence demonstrated that the alleged broad protective sweep in this case was improperly performed as a matter of police department routine, and Weddle claimed that he "was not sure" if anyone else was in the house. Appellant's Br. p. 12. Weddle also points out that Officer Allen stated that he did not hear anyone else in the house after Weddle had been secured. And Officer Thurman testified that although he heard movement after first encountering Weddle, he could not tell where the noise was coming from or how many people were in the house.

Weddle claims that because Detective Chandler did not actually know whether there was another person in the house, there was no justification for such a broad protective sweep. As a result, Weddle contends that the police officers' actions were contrary to the rule set forth in Scott v. State, which provides that

> [t]he combined knowledge of the facts that the manufacture of methamphetamine can be dangerous and that there were possibly other individuals on the property that were capable of causing bodily harm would cause any reasonable police officer to see the immediate need to identify

8

any remaining persons on the property, and insure they did not pose a risk of harm.

803 N.E.2d 1231, 1236 (Ind. Ct. App. 2004). Weddle suggests that although both his vehicle—and Hall's—were at the residence and it was reasonable to infer that they were both inside, it was unreasonable for the officers to infer that there was someone else inside who might pose a danger to them.

Also, while Weddle argues that the officers' entry into one of the adjoining rooms was appropriate, he claims that Detective Chandler's search of additional rooms was not. In other words, Weddle claims that the officers had no reason to believe that a dangerous individual might have been inside the home.

In support of these contentions, Weddle asserts that the trial court's reliance on Hannibal v. State, 804 N.E.2d 206 (Ind. Ct. App. 2004), is misplaced. In Hannibal, police officers were serving a drug-related arrest warrant on Hannibal and a class A felony arrest warrant on Hall, who resided with Hannibal. The officers knew that "Hannibal had been investigated for handgun-related offenses and Hall had been in incidents involving firearms, resisting law enforcement, and serious bodily injury." Id. at 208. When knocking on the apartment door, a detective "noticed the apartment's window blinds move and heard the sound of running." Id. The door to the apartment was then opened by Hannibal's two-year-old son. Id. at 209.

Hannibal immediately ran to the door, slammed it on the police officers, and locked it. The officers then forced their way into the residence. Id. at 208. Following

9

the arrests, the police officers had to make arrangements for Hannibal's child. Because of the officers' knowledge of the details surrounding Hall's arrest warrant, Hannibal's and Hall's criminal histories, and the concern that some other individual may have run upstairs to another room, the officers performed a protective sweep of the apartment because they were uncomfortable standing with their backs to the apartment. Id. at 209.

On appeal, this Court concluded that the protective sweep was valid under the Fourth Amendment. More specifically, it was determined that "the officers had reasonable suspicion to believe their safety was threatened by the possible presence of an individual on the second floor." Id. at 209-10. Also, the officers' knowledge of Hall and Hannibal "gave them good reason to believe the two might be—or associate with those who are—disposed to safety-threatening activity." Id. The evidence also showed that the police officers had reason to believe that someone might have been on the second floor because one of the detectives heard a noise like someone was running up the stairs. Id. at 210.

Weddle urges that this case is distinguishable from Hannibal because the officers did not go to Weddle's house to serve an arrest warrant for a serious, violent felony or for a drug-related offense. The officers also did not have prior knowledge suggesting that Weddle was dangerous or that he was known to associate with dangerous individuals.

Notwithstanding Weddle's claims, we find that the protective sweep of Weddle's residence was justified because the police officers searched only adjoining rooms from which an attack could immediately occur. See Buie, 494 U.S. at 334 (holding that police

10

officers may look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched).  And in interpreting Buie, at least one federal court of appeals has specifically held that Buie permits the police to "walk through rooms adjacent to the one in which they make an arrest to ensure that no danger lurks within."  United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995).

In this case, Detective Chandler testified that he moved through "open doors" into the "connecting rooms of the residence."  Tr. p. 79, 459.   The floor plan of the house demonstrates that an attack could take place immediately from those unconnected rooms.

We further find that the protective sweep was permissible because the officers had specific articulable facts that an individual, who could jeopardize their safety, was hiding in the back of the house.  Relying on the rationale in Hannibal, the police officers may search rooms that are not immediately adjacent to the area of the arrest when there is reasonable suspicion that the rooms might contain a person who is hiding and may jeopardize officer safety.  804 N.E.2d at 209.   At least one court has determined that

> [o]fficers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area.  An ambush in a confined setting of unknown configuration is more to be feared than if it were in the open, more familiar surroundings.

United States v. Tapia, 610 F.3d 505, 511 (7th Cir. 2010).

As discussed above, the evidence established that when the officers knocked and announced their presence, several individuals were heard inside moving around but no one answered the door.  Tr. p. 6-7, 13-14, 23, 25, 60, 384.  The police officers also had

11

information that Weddle and/or Hall were involved in the manufacture and dealing of methamphetamine.

After securing Weddle, the police officers found Hall in another room, but she was initially uncooperative. The officers then heard movement in the back of the house, which they believed indicated at least one other person was present. In fact, the officers had particular information that another person, Adams, might be present. Tr. p. 98, 112, 114, 514.

Immediately thereafter, Detective Chandler asked Weddle if anyone else was in the house. Weddle was evasive and stated that he was "unsure" if anyone else was there. Id. at 63-64, 99, 456. In light of these circumstances, it was reasonable for the police to conduct the protective sweep of the residence. In fact, it may very well have been irresponsible for the police officers not to proceed in this manner. And they did, in fact, find Burton, who was wanted on an arrest warrant, hiding in the back of the house. Id. at 78, 90, 101, 461-62.

The State also correctly points out that Detective Chandler did not search the entire residence. Tr. p. 105, 458. In fact, the only item that the officers even moved was the blanket where they observed Burton's feet protruding from the bottom of it while hiding from the police. Id. at 78, 90, 101, 461-62. Also, the officers ceased the five-minute protective sweep as soon as they found Burton. In short, Weddle's claim that the scope of the protective sweep was excessive under the Fourth Amendment fails.

12

## II. Indiana Constitution

Notwithstanding our conclusion that the protective sweep and warrantless search of the adjoining rooms in the residence did not violate the Fourth Amendment, Weddle contends that the police officers' actions violated the provisions of Article I, Section 11 of the Indiana Constitution. More specifically, Weddle argues that "vague references to 'movement,' if any, from unknown sources and locations, and the absence of articulable facts suggesting the presence of a dangerous individual in the home, shows a lack of need to sweep the entire house." Appellant's Br. p. 21.

The purpose of Article I, Section 11 is "to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." Trotter v. State, 933 N.E.2d 572, 580 (Ind. Ct. App. 2010). Although the language of Article I, Section 11 tracks the Fourth Amendment verbatim, Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure. Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). Instead, the legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of police conduct under the totality of the circumstances. Id.

The reasonableness of a search or seizure depends on a balance of: "1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs." Id. at 361. The burden is on the State to

13

show that the intrusion was reasonable in light of the totality of the circumstances. Hathaway v. State, 906 N.E.2d 941, 945 (Ind. Ct. App. 2009).

In this case, Weddle does not succeed in his claim that the degree of intrusion was beyond what was necessary to execute the arrest because the officers had sufficient concern or knowledge that a "knowing violation had occurred" under the first factor under Litchfield. The officers also learned that Weddle may have been involved in drug dealing and, therefore, could reasonably presume that armed and dangerous individuals could be present in the residence. Once Weddle had been arrested, the police officers heard additional movement, thus indicating that someone else was in the back of the house. In our view, these facts and circumstances supplied the officers with a high degree of concern that another person could be hiding in the house and attack them.

The second factor in Litchfield—the degree of intrusion—similarly weighs in favor of the protective sweep. Specifically, the officers legally entered Weddle's unlocked residence to serve an arrest warrant when he refused to answer the door. I.C. § 35-33-2-3(b); Estep, 753 N.E.2d at 26. Weddle was placed in custody at 10:36 a.m., and the officers immediately conducted the low-intrusion protective sweep—quickly moving from room-to-room looking only for people, not searching containers or the like, and moving only the blanket after viewing Burton's feet behind it. Tr. p. 101, 105, 459. The protective sweep lasted only about five minutes. Id. at 17, 89-90, 103, 457-58, 545. In short, the degree of intrusion was low.

14

Finally, the circumstances establish that the extent of the police officers' need not to be ambushed or attacked was high. The police officers certainly had the right to serve Weddle with the arrest warrant, to enter the residence after Weddle's refusal to let them in, and to protect their safety. Also, as discussed above, Weddle provided evasive answers about who was in the house based on the noise that came from the back of the house. Tr. p. 31, 45, 47-49, 51, 63-64, 99-100, 102, 116-17, 401, 455-56.

In our view, the circumstances here supplied the officers with a high degree of concern that another individual could be hiding in the house and attack them. Hence, the protective sweep and the subsequent search following the issuance of the search warrant were reasonable under the Indiana Constitution. Therefore, the trial court did not err in admitting the items into evidence that the police officers had seized during the search of the residence.

The judgment of the trial court is affirmed.

MAY, J., and BRADFORD, J., concur.