## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 29 2015, 9:09 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dwight Patton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 29, 2015

Court of Appeals Cause No.
60A01-1403-CR-115

Appeal from the Owen Circuit Court

Lower Court Cause No.
60C01-1107-FD-417

The Honorable Lori Thatcher
Quillen, Judge

**Pyle, Judge.**

## Statement of the Case

[1] Appellant/Defendant, Dwight Patton ("Patton"), appeals his conviction for Class D felony possession of marijuana in an amount greater than thirty (30)

grams.[1] His conviction was based on marijuana seized from his barn, a patch beside his barn, and a wagon beside his house. On appeal, he does not challenge the trial court's admission of the marijuana found in the patch or wagon but argues that the trial court abused its discretion in admitting the marijuana seized from his barn because the seizure resulted from a search that he claims violated his constitutional rights under the United States and Indiana Constitutions. He also argues that the State did not produce sufficient evidence that the weight of the marijuana supporting his conviction exceeded thirty (30) grams, as was required to convict him of a Class D felony rather than a Class A misdemeanor. We conclude that the search of Patton's barn and seizure of the marijuana did not violate Patton's rights under the United States Constitution because there were exigent circumstances and the marijuana was in plain view. The search and seizure also did not violate the Indiana Constitution because the State troopers' actions were reasonable. Finally, we conclude that there was sufficient evidence that Patton possessed more than thirty (30) grams of marijuana.

We affirm.

# Issues

1. Whether the trial court abused its discretion in admitting evidence.

---

[1] IND. CODE § 35-48-4-11(1). We note that, effective July 1, 2014, a new version of this statute was enacted and Patton's offense would now qualify as Class B misdemeanor. However, because Patton committed his offense in 2011, we will apply the statute in effect at that time.

2. Whether the State produced sufficient evidence that Patton possessed more than thirty (30) grams of marijuana.

## Facts

On July 14, 2011, Indiana State Police ("ISP") troopers Tim Cummins ("Trooper Cummins"), Kurt Feather ("Trooper Feather"), Jason Kempf ("Trooper Kempf"), and Larry Annick ("Trooper Annick"), who are troopers in the ISP Marijuana Eradication Program, flew over Central Indiana in a helicopter trying to spot outdoor marijuana cultivation. They were heading to Hulman Field in Terre Haute to refuel their helicopter when they passed over property that Patton was renting in Owen County ("Patton's Property").[2] On the property were a single-story residence, a large vegetable garden to the west of the residence, and a dilapidated barn to the west of the garden. The barn was about fifty yards from the road and 100 yards from the residence.[3] Trooper Feather thought that he saw marijuana plants next to the barn and told the

---

[2] For ease of reference, we will refer to the property as "Patton's Property," even though he did not own the property.

[3] Trooper Cummins testified to these lengths at trial. In contrast, Trooper Kempf testified at trial that the barn was about 150 yards from the house. Trooper Feathers testified at the suppression hearing that the barn was twenty-five to 100 yards from the house. We will consider the distance between the house and the barn 100 yards as all three troopers agree that it was potentially that far. In addition, to the extent Trooper Feathers testified that the distance might only be twenty-five yards, that testimony contradicts the testimony of the other two troopers, and we may only consider evidence produced in a suppression hearing to the extent it does not contradict later trial testimony. *Morris v. State*, 871 N.E.2d 1011, 1016 (Ind. Ct. App. 2007), *trans. denied.*

other troopers that he wanted to return to the property for further investigation after refueling.

[6] Accordingly, the troopers flew back over the property an hour or two later after refueling. Trooper Cummins observed that there was indeed a patch containing what appeared to be rows of marijuana plants behind Patton's barn. He estimated that there were thirty plants in total. The patch was also partially bordered by eight to twelve foot tall horseweeds, which resemble marijuana.[4] Trooper Kempf took aerial photographs of the property, including the barn and the marijuana patch.

[7] It was the troopers' normal procedure to mark the locations of marijuana they discovered on a handheld GPS unit so that they could follow up at another time and avoid landing the helicopter. However, they also had a policy that if they observed a person on a property where they had discovered marijuana, they would investigate immediately to avoid potential destruction of evidence. On their second pass around Patton's Property, the troopers noticed a man near the garden. As a result, they decided to land their helicopter and investigate immediately. While they were trying to find somewhere to land, they saw the man, whom they later identified as Patton, in the marijuana patch pulling up the marijuana plants.

---

[4] Trooper Cummins testified that the horseweeds were ten to twelve feet tall, and Trooper Feathers testified that the horseweeds were eight to ten feet tall.

[8] Approximately three to four minutes later, the troopers landed directly across the road on the other side of the barn. Trooper Cummins ran to the barn and found Patton inside on his hands and knees. He made Patton stand and noticed that Patton was "[v]ery dirty", "very hot, . . . profusely sweating, [and] . . . had mud starting to drip down him." (Tr. 226). At his request, Patton left the barn and sat on a cinder block in the yard.

[9] Meanwhile, Trooper Feathers ran to the marijuana patch and observed that the dirt in the patch had been disturbed, and only two of the marijuana plants remained. When he told Trooper Kempf that most of the plants were gone, they both attempted to search for the plants in the horseweeds surrounding the marijuana patch. When they did not find any of the plants there, Trooper Cummins told Trooper Kempf about finding Patton in the barn, and Trooper Kempf went to that spot in the barn. He got on his hands and knees—the position in which Trooper Cummins had found Patton—and spotted some marijuana plants through a hole in the barn's floor. He could not reach the plants from the inside of the barn, so he walked outside and was able to retrieve them through another hole on the outside of the barn. In total, he retrieved ten marijuana plants. He observed that they appeared to be "freshly pulled up" and still had dirt and roots attached. (Tr. 330). All of the plants were immature.[5]

---

[5] Trooper Cummins later testified that this was because marijuana is not usually harvested until the end of September or beginning of October, and these plants were seized in July.

[10]     While the troopers were at the scene, they searched the immediate area around the marijuana patch, and Patton's wife gave consent for them to search the house. Although they did not find any plants in the house, they did discover a wagon with thirty-eight starter marijuana plants in Styrofoam cups by the backside of the garden, near the house.[6] Patton talked to Trooper Cummins and admitted that the starter plants were his, although he denied having anything to do with the marijuana plants in the patch and barn. Before leaving, Trooper Feathers went back up into the helicopter to see if he could find any of the remaining eighteen missing plants from the air, but he did not have any success.

[11]     Subsequently, Haley Newton ("Newton"), a forensic scientist with the ISP Lab, analyzed the plants obtained from Patton's Property and confirmed they were indeed marijuana plants. She found that the marijuana recovered from the barn and patch weighed 20.47 grams, and the starter marijuana plants from the wagon weighed 14.88 grams. In total, the plant material weighed 35.35 grams.

[12]     Thereafter, on July 15, 2011, the State charged Patton with two counts of Class D felony possession of marijuana in an amount over thirty (30) grams, including one count under INDIANA CODE § 35-48-4-11(1) for possessing it and one count under INDIANA CODE § 35-48-11(2) for growing it.[7] On June 18,

---

[6] The starter plants were six to eight inches tall.

[7] It is apparent that the State combined the weights of the marijuana seized from Patton's patch, barn, and wagon to exceed the thirty grams required for a Class D felony.

2012, Patton filed a motion to suppress the evidence of the marijuana.[8] He filed a second motion to suppress on October 3, 2013, in which he argued that the troopers had violated his federal and state constitutional rights to be free from unreasonable search and seizure and that, accordingly, the trial court should suppress the evidence seized from the search of his barn. Notably, he did not argue that the trial court should suppress the evidence of the marijuana found in the patch or the wagon.

[13] On October 7, 2013, the trial court held a hearing on Patton's motion to suppress, which it ultimately denied. The trial court then held a jury trial on October 9-11, 2013. On the first day of the trial, Patton made a motion in limine, again requesting the trial court to suppress the barn marijuana evidence. The trial court denied the motion but showed Patton's continuing objection to any admission of the marijuana into evidence. At trial, the trial court admitted all the marijuana, and at the conclusion of the trial, the jury found Patton guilty as charged. Subsequently, the trial court held a sentencing hearing on November 12, 2013. It merged Patton's convictions and sentenced him to 1,095 days, with 180 days executed on home detention and the rest suspended to probation. Patton now appeals.[9]

---

[8] Patton cites that this motion is included on page forty-six of his Appendix, but page forty-six of the Appendix is missing.

[9] Patton filed both a motion for leave to file a belated notice of appeal and an amended motion for leave to file a belated notice of appeal. The trial court granted the amended motion.

# Decision

[14] On appeal, Patton argues that the trial court abused its discretion in admitting the evidence of the marijuana seized from his barn because the troopers' search of the barn was unconstitutional under both the United States and Indiana constitutions. Alternately, he asserts that the State did not produce sufficient evidence that the marijuana he possessed weighed more than thirty (30) grams, as was required to convict him of a Class D felony as opposed to a Class A misdemeanor. We will address each of these arguments in turn.

## 1. Constitutional Claims

[15] First we will consider the trial court's admission of the evidence of the marijuana seized from Patton's barn. Because Patton did not seek an interlocutory appeal of his motion to suppress evidence, we consider the trial court's admission of the evidence at trial rather than its denial of his motion to suppress. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We review a trial court's decision to admit evidence for an abuse of discretion, which we will find if the court's decision is clearly against the logic and effect of the facts and circumstances before it, and the error affects a party's substantial rights. *Id.* In making this determination, we do not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court. *Weddle v. State*, 989 N.E.2d 371, 375 (Ind. Ct. App. 2013), *aff'd on reh'g, trans. denied.* We review any questions of law, such as the ultimate determination of the constitutionality of a search and seizure de novo. *Carpenter*, 18 N.E.3d at 1001.

Patton's admissibility argument is founded on his assertion that the troopers conducted an unconstitutional search of the inside of his barn and that the evidence they discovered as a result of the search was, thus, inadmissible. Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution protect against unreasonable searches and seizures, and both use similar language.[10] In spite of their similarities, however, we analyze claims differently under each constitution. Accordingly, we will first address Patton's claims under the Fourth Amendment and then turn to Article 1, Section 11.

## A. United States Constitution

Patton first argues that the troopers' search of the inside of his barn violated the Fourth Amendment's prohibition against unreasonable searches and seizures because they did not have a warrant and because no exceptions to the Fourth Amendment's warrant requirements applied. In response, the State argues that the troopers did not need a warrant because Patton's barn was not protected by the Fourth Amendment. Alternately, the State contends that exceptions to the Fourth Amendment applied because the marijuana was in plain view, and Patton's attempted disposal of the marijuana created exigent circumstances.

To trigger Fourth Amendment protections, a search arises out of an intrusion by a government actor upon an area in which a person maintains "'a reasonable

---

[10] The Fourth Amendments protections extend to the states through the Fourteenth Amendment. *Dora v. State*, 957 N.E.2d 1049, 1052 (Ind. Ct. App. 2011), *reh'g denied, trans. denied*.

expectation of privacy.'" *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). A constitutionally protected expectation of privacy exists where there is both a subjective expectation of privacy and societal recognition that such expectation of privacy is reasonable. *Dora v. State*, 957 N.E.2d 1049, 1052 (Ind. Ct. App. 2011), *reh'g denied*, *trans. denied*. The United States Supreme Court has held that the land immediately surrounding and associated with the home, known as the curtilage, merits Fourth Amendment protections. *Id.* In contrast, a person does not have a legitimate expectation of privacy in open field areas that fall beyond a home's curtilage. *Oliver v. United States*, 466 U.S. 170, 181 (1984). These "open fields" need be neither open nor fields. *Blalock v. State*, 483 N.E.2d 439, 443 (Ind. 1985). In addition, the Fourth Amendment also does not protect "'activities or items that, even if within the curtilage, are knowingly exposed to the public.'" *Dora*, 957 N.E.2d at 1052 (quoting *Trimble v. State*, 842 N.E.2d 798, 802 (Ind. 2006)).

[19] Citing the above precedent, the State argues that Patton's barn was outside of the curtilage and, therefore, was not protected by the Fourth Amendment. However, we need not address this argument, because the Troopers' search and seizure were reasonable even if the barn was protected by the Fourth Amendment.

[20] A search or seizure conducted without a warrant in an area protected by the Fourth Amendment is *per se* unreasonable. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008). However, there are a few well-delineated exceptions,

including when exigent circumstances exist and when an officer conducts a lawful search and discovers an item in plain view. *Id*; *see Justice v. State*, 765 N.E.2d 161 (Ind. Ct. App. 2002), *decision clarified on reh'g.* If a warrantless search or seizure is conducted, the burden is on the State to prove that, at the time of the search or seizure, an exception to the warrant requirement existed. *Id.*

[21]     One exception to the Fourth Amendment warrant requirement allows police to dispense with obtaining a warrant if there are exigent circumstances— specifically where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Holder*, 847 N.E.2d at 936-37 (quoting *Mincey v. Arizona*, 437 U.S. 38, 394 (1978)). Among the exigencies that may properly excuse the warrant requirement are threats to the lives and safety of officers and others and the imminent destruction of evidence. *Id.*

[22]     Another exception to the Fourth Amendment warrant requirement is the plain view doctrine. Under the plain view doctrine, an officer may seize evidence if: (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating character of the evidence is immediately apparent; and (3) the officer has a lawful right of access to the object itself. *Middleton v. State*, 714 N.E.2d 1099, 1101 (Ind. 1999).

[23] Here, the troopers, while lawfully flying above the property, observed marijuana growing on the property in plain view. This observation was not a Fourth Amendment violation. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (noting that the Court has held "on two different occasions . . . that aerial surveillance of private homes and surrounding areas does not constitute a search" under the Fourth Amendment) (citing *Florida v. Riley*, 488 U.S. 445 (1989) (plurality opinion); *California v. Ciraolo*, 476 U.S. 207 (1986)).

[24] The troopers then observed Patton near the marijuana, and, while they were still in the air, they saw Patton start to pull up the marijuana and take the removed plants into the dilapidated barn. These observations created exigent circumstances—namely, the potential, imminent destruction of evidence. *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search") (citations and quotations omitted). Thus, the troopers were justified in landing on Patton's property and following Patton into the barn without a warrant.

[25] Finally, once inside the barn, the troopers observed Patton on his hands and knees on the floor of the barn before they placed him under arrest. After they had detained Patton, Trooper Kempf then got on his hands and knees where Patton had been and observed, through a hole in the floor, the marijuana plants Patton had removed. Trooper Kempf was also able to observe the uprooted plants from outside the barn. As a matter of Fourth Amendment law, Trooper Kempf was in a place where he had a legal right to be and he observed the

plants in plain view from that location. *See, e.g.*, *Texas v. Brown*, 460 U.S. 730, 740 (1983) (holding that the officer's change in position, which included "ben[ding] down at an angle, . . . is irrelevant to Fourth Amendment analysis") (quotation omitted). In light of these exceptions to the warrant requirement, we conclude that the troopers' search and seizure did not violate Patton's constitutional right to privacy under the Fourth Amendment. However, because we analyze the Indiana Constitution differently from the United States Constitution, we will turn to address Patton's claims under the Indiana Constitution.

**B. Indiana Constitution**

[26]     Article 1, Section 11 of the Indiana Constitution, like the Fourth Amendment, prohibits unreasonable searches and seizures. However, although the language of Article 1, Section 11 is almost identical to the language of the Fourth Amendment, interpretations and applications between them vary. *Holder,* 847 N.E.2d at 935. This is because Indiana courts have "explicitly rejected the 'expectation of privacy' as a test of the reasonableness of a search or seizure." *Mundy v. State*, 21 N.E.3d 114, 118 (Ind. Ct. App. 2014) (quoting *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005)).

[27]    Under the Indiana Constitution, the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Id.* We determine the reasonableness of a search or seizure by balancing: (a) the degree of concern, suspicion, or knowledge that a

violation has occurred; (b) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities; and (c) the extent of law enforcement needs. *Rush*, 881 N.E.2d at 52. We give Article 1, Section 11 a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy, *id.*, and the State must bear the burden of showing that, under the totality of the circumstances, an intrusion was reasonable. *Mitchell*, 745 N.E.2d at 786.

[28] As for the first factor, the troopers here had a high degree of suspicion that a violation had occurred because they had identified thirty marijuana plants on Patton's Property from their helicopter, and they had seen Patton attempting to pull the plants up. When they arrived at the marijuana patch, only two of the marijuana plants remained.

[29] As for the second factor, the troopers' degree of intrusion was relatively low. It is apparent from the record that the troopers' discovery of Patton and subsequent discovery of the marijuana occurred within a relatively short time frame, and, therefore, the troopers did not unreasonably interfere with Patton's ordinary activities. In addition, the scope of the search was narrow because Trooper Kempf contained his search to the area of the barn where Trooper Cummins had discovered Patton. Accordingly, we conclude that the troopers' level of intrusion was relatively minimal.

[30] Finally, as for the third factor, it is clear that the extent of law enforcement needs was strong. The troopers had identified thirty marijuana plants on

Patton's Property from their helicopter and only found two plants remaining when they arrived at the patch. They knew that a violation had occurred and needed to find the marijuana before it was destroyed. Further, because the troopers saw Patton pulling up the plants and very little time had passed before they landed their helicopter and arrived at the patch, the troopers knew that the plants were likely within the vicinity of the patch and barn.

[31] In regards to Patton's argument that, because he was detained, the troopers did not have an extensive law enforcement need to find the marijuana because he could not continue to destroy the marijuana while detained, we note that it is true that Patton could not continue to destroy evidence. However, that does not affect the fact that the troopers knew Patton had committed a violation, knew the marijuana was in the vicinity of the barn, and needed to obtain it for law enforcement purposes. The fact that Patton was detained does impact the extent of law enforcement need but not to the point that the troopers did not need to find the marijuana.

Furthermore, even if we were to decide this factor in Patton's favor, we must balance the three factors, and the troopers had knowledge a violation had occurred and only minimally intruded on Patton's ordinary activities. Therefore, we conclude that the troopers' actions were reasonable under the totality of the circumstances and did not violate Article I, Section 11 of the Indiana Constitution. Accordingly, the trial court did not abuse its discretion in admitting the evidence of the marijuana recovered from the barn.

## 2. Sufficiency

[32] Next, Patton argues that the State did not present sufficient evidence that the marijuana he possessed weighed more than thirty grams, which was the amount required to convict him of possession of marijuana as a Class D felony. The standard of review for a sufficiency of the evidence claim is that this Court should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the verdict and the reasonable inferences stemming from that evidence. *Id.*

[33] At the time of Patton's offense, INDIANA CODE § 35-48-4-11 provided that a person who "knowingly or intentionally possesse[d] (pure or adulterated) marijuana" in an amount greater than thirty grams committed Class D felony possession of marijuana. However, the offense was a Class A misdemeanor if the amount involved was thirty grams or less. I.C. § 35-48-4-11. Also at that time, INDIANA CODE § 35-48-1-19 defined "marijuana" as:

> Any part of the plant genus Cannabis whether growing or not; the seeds thereof; the resin extracted from any part of the plant, including hashish and hash oil; any compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant; fiber produced from the stalks; oil or cake made from the seeds of the plant; any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin

extracted therefrom); or the sterilized seed of the plant which is incapable of germination.[11]

For purposes of determining whether a defendant has possessed more than thirty grams of marijuana, we may also consider the weight of any adulterated marijuana, which includes "'other vegetable material' not included within the definition of marijuana." *Adams v. State*, 968 N.E.2d 281, 286 (Ind. Ct. App. 2012) (quoting *Allison v. State*, 527 N.E.2d 234, 238 (Ind. Ct. App. 1988), *trans. denied*), *trans. denied.*

Patton's first argument with respect to the weight of the marijuana is that the State did not prove that the marijuana the ISP Lab weighed was dry. He contends that if the marijuana were not dry, its weight could have included external water weight. In support of this argument, he cites to *Lycan v. State*, 671 N.E.2d 447, 457 (Ind. Ct. App. 1996), where this Court held that the aggregate weight of marijuana for the purposes of an offense enhancement could not include external water weight. In *Lycan*, the marijuana at issue was "very wet" when it was first weighed and weighed ten and a half pounds. *Id.* at 452. In contrast, the marijuana only weighed nine pounds after it dried, and that amount was not sufficient to support Lycan's conviction for Class C felony possession with the intent to deliver more than ten pounds of marijuana. *Id.* at 459.

---

[11] This statute was amended, effective March 6, 2014.

[34] Unlike *Lycan*, however, there is no evidence here that the marijuana Newton from the ISP Lab measured was wet and contained excess water weight. Trooper Feather testified that he left the marijuana in a room that the State Troopers call the "dry room" so that it could dry until it "really dr[ied] out." (Tr. 336). Newton also testified that the ISP Lab would not accept wet plant material for analysis. Based on this evidence, it is clear that the marijuana was dry, and Patton's argument that it might have contained external water weight is pure speculation that we will not consider.

[35] In a second challenge to the weight of the marijuana, Patton contends that the plant material Newton weighed at the lab might have included some horseweed. However, Trooper Feather specifically testified that the samples he sent to the lab did not contain any horseweed or any parts of horseweed plants. We will not reweigh the evidence. *Perez*, 872 N.E.2d at 213. Accordingly, we conclude that the State presented sufficient evidence that Patton possessed more than thirty grams of marijuana.

Affirmed.

Najam, J., and Bailey, J., concur.